599 N.W.2d 619 (1999)
1999 ND 184
In the Matter of the Application for DISCIPLINARY ACTION AGAINST Fintan L. DOOLEY, a member of the bar of the State of North Dakota.
Disciplinary Board of the Supreme Court of the State of North Dakota, Petitioner
v.
Fintan L. Dooley, Respondent
Nos. 980378, 980393.
Supreme Court of North Dakota.
September 22, 1999.
*620 Paul W. Jacobson, Assistant Disciplinary Counsel, Bismarck, for petitioner.
John M. Olson, Olson Cichy, Bismarck, for respondent.

REPRIMAND ORDERED.
PER CURIAM.
[¶ 1] The Disciplinary Board petitions for disciplinary action against Fintan L. Dooley and recommends Dooley be reprimanded and ordered to make $16,666.65 in restitution to a former client for violating N.D.R. Prof. Conduct 1.5(a), and be reprimanded for violating N.D.R. Prof. Conduct 1.7(a) and 1.16(e). We conclude Dooley did not charge an unreasonable fee within the meaning of N.D.R. Prof. Conduct 1.5(a), and need not make restitution to the client, and he did not have an impermissible conflict of interest in violation of N.D.R. Prof. Conduct 1.7(a). We further conclude Dooley failed to return funds to a client upon termination of representation in violation of N.D.R. Prof. Conduct 1.16(e). We order Dooley be reprimanded for that violation.

I
[¶ 2] Fintan L. Dooley was admitted to practice law in North Dakota on January 2, 1976. On September 23, 1987, Dooley entered into a one-third contingent fee agreement with Teddy Lee Cahill to represent him on his claim for personal injuries *621 suffered in a railroad accident. Cahill had received workers compensation benefits for his injuries, and Dooley, on May 18, 1989, executed an agreement to represent the Workers Compensation Bureau under N.D.C.C. § 65-01-09 for its subrogation interest in connection with any action involving Cahill's claims. Dooley informed Cahill by memo, "I ask you, after careful review of our fee agreement, to recognize that our fee agreement entitles me to receive one-third of all recoveries made from the Bureau or from the hospitals or from the railroads." Cahill testified he understood and agreed the gross recovery included the subrogation interest of the Bureau, and he would pay one-third of the gross recovery as an attorney fee to Dooley.
[¶ 3] Dooley brought an action on Cahill's behalf against Burlington Northern Railroad Company for damages resulting from his personal injuries. With Cahill's consent, Dooley retained other lawyers to assist him with the action against Burlington Northern. Dooley was responsible for paying associate counsel fees, specifically agreeing with Cahill their fees "will be paid out of my share of the recovery."
[¶ 4] On January 26, 1994, Burlington Northern entered into a $400,000 settlement agreement with Cahill, Dooley, the Bureau, and Diane Schwandt. Schwandt and Cahill live together with their children as a family unit. Cahill and Schwandt "released and discharged" Burlington Northern "from any and all known and unknown ... causes of actions" resulting from the accident. Although Schwandt was not a party to the action and was not married to Cahill, she executed the release and settlement because, in the words of the release, "at the time of his injury Teddy Lee Cahill was living with Diane Schwandt and she may have a consortium claim arising out of this accident." Before signing the settlement, a Bureau representative had the following language added: "The Bureau by signing this release does not waive its right to assert its subrogation interest to any claims for consortium."
[¶ 5] Burlington Northern's settlement with Cahill and the Bureau was shared equally by them in accordance with the provisions of N.D.C.C. § 65-01-09. First, the lawyers received one-third of the gross amount of recovery, less the retainer paid by Cahill, for a total of $127,333.33. The Bureau received its one-half share, less 25 percent for attorney fees and its share of the costs, for a total of $118,595.57. Cahill's lawyers received their advanced costs, totaling $67,419.07. Cahill received the remaining amount of $86,652.04. The amount of attorney fees payable by the Bureau under N.D.C.C. § 65-01-09 was not actually paid by the Bureau to Dooley, but the Bureau's share of the settlement was reduced by that amount. The effect of the allocation was Cahill paid the entire amount of attorney fees in accordance with his agreement with Dooley, and was partially reimbursed by the reduction of the amount paid to the Bureau. This allocation resulted in Cahill effectively paying Dooley almost 42 percent of his share of the settlement as an attorney fee.
[¶ 6] Dooley prepared a check on his trust account to the Bureau for its $118,595.57 share, but did not deliver it to the Bureau. Instead, Dooley agreed to represent Schwandt in an action against the Bureau to recover her consortium claim from part of Burlington Northern's settlement payment. The Bureau rejected Schwandt's consortium claim to the extent it would reduce the amount payable to the Bureau on its subrogation interest. Dooley wrote Schwandt to advise her of the Bureau's refusal to allocate any part of its subrogation interest to her on a consortium claim, and requested her and Cahill's agreement to "enter into contest with the North Dakota Workers Compensation Bureau on our behalf to obtain free of [the] Bureau's subrogated claim additional funds not already distributed to us but claimed by the Bureau." Cahill and Schwandt executed *622 an "Acknowledgment" of this agreement on February 22, 1994.
[¶ 7] Dooley wrote to the Bureau and explained a new allocation would be made for payment of the settlement proceeds. Dooley allocated $200,000 to Cahill for settlement of his claims and allocated $200,000 to Schwandt for settlement of her loss of consortium claim. Cahill's net recovery and attorney fees and costs remained the same, but the Bureau's share was reduced to one-half of Cahill's share and was further reduced by costs and the 25 percent statutory attorney fee payable by the Bureau. Dooley voided the check he had previously written to the Bureau, and wrote two new checks on February 22, 1994. Dooley wrote one to the Bureau for $43,595.57 in settlement of its subrogation interest in Cahill's claim against Burlington Northern and wrote another for $75,000 payable to himself in trust for Schwandt. Dooley also informed the Bureau he was preparing a complaint seeking a declaratory judgment against it for Schwandt's loss of consortium claim.
[¶ 8] In April 1995, Cahill and Schwandt terminated Dooley's representation and retained Dale W. Moench to represent them for their claims against the Bureau. On November 14, 1995, Moench and Stephen D. Easton, a special assistant attorney general representing the Bureau, wrote Dooley requesting he deliver the $75,000 and accrued interest to Schwandt and the Bureau. After Dooley failed to respond, Moench and Easton wrote in December 1995 and repeated their request. On January 5, 1996, Dooley responded:
I have your letters. Now, I again give notice of my attorney's lien in these funds contingent upon a decision favorable to Diane Schwandt based either upon loss of consortium or her provision of services to a disabled person.
I enclose copy of most recent statement received for this account showing a balance of $80,032.51. I await either a court order or an agreement which pays me an agreeable sum.
As a final alternative, under the statute I would agree to make deposit of the funds on the provision that no distribution of the one third I claim would be made without opportunity for hearing or an agreement between the parties.
[¶ 9] Easton wrote Dooley's attorney on June 26, 1996, agreeing to Dooley's suggestion the funds be deposited with the district court. The court ordered deposit of the funds on July 11, 1996, pending the outcome of the loss of consortium claim, and Dooley deposited the funds with the court on August 8, 1996. Schwandt's loss of consortium claim was resolved without Dooley's further involvement.
[¶ 10] In November 1996, Dooley was served an amended petition for discipline alleging he had violated N.D.R. Prof. Conduct 1.5 because he charged Cahill an unreasonable attorney fee, and he had violated N.D.R. Prof. Conduct 1.16 by failing to turn over the $75,000 and interest to his client and the Bureau after he was terminated as Schwandt's attorney. In June 1997, Dooley was served a separate petition for discipline alleging he violated N.D.R. Prof. Conduct 1.7(a) and (c) by having an impermissible conflict of interest in representing Schwandt in her loss of consortium action against the Bureau regarding the $75,000 placed in his trust account when he had represented the Bureau on its subrogation interest in the same underlying matter.
[¶ 11] The dispute was heard by a hearing body of the Disciplinary Board on November 18, 1997. The hearing body filed its recommended findings and discipline on April 2, 1998, finding Dooley had committed each violation and recommending he be reprimanded and ordered to make $16,666.65 in restitution to Cahill for charging him an unreasonable fee. The Disciplinary Board adopted the hearing body's findings and recommendations for discipline and submitted its report to this Court. Dooley timely filed objections to the report and both parties presented briefs and oral *623 argument. We consider the report of the Disciplinary Board under N.D.R. Lawyer Discipl. 3.1(G).

II
[¶ 12] We review disciplinary proceedings against attorneys de novo on the record under a clear and convincing standard of proof. Matter of Leier, 1997 ND 79, ¶ 3, 562 N.W.2d 741. Although we give due weight to the findings, conclusions, and recommendations of the Disciplinary Board, we do not automatically accept those findings; we decide each case on its own facts. Disciplinary Action Against Anseth, 1997 ND 66, ¶ 20, 562 N.W.2d 385.

A
[¶ 13] What attorneys charge for their services is primarily a matter of agreement between the lawyer and the client. ABA/BNA Lawyers' Manual On Professional Conduct, at 41:301 (1994) (ABA/BNA Manual). However, N.D.R. Prof. Conduct 1.5(a) requires a lawyer's fee to be reasonable:
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee is fixed or contingent.
Attorney fees charged in excess of the amount allowed under statute or rule are not reasonable. See In re Disciplinary Action Against Moe, 1999 ND 110, ¶¶ 10-16, 594 N.W.2d 317; ABA/BNA Manual, at 41:314.
[¶ 14] In finding Dooley charged Cahill an unreasonable fee, the Disciplinary Board reasoned:
Dooley's agreement with the Bureau provides: "I understand and agree that attorney fees and costs will be prorated in accordance with Section 65-01-09 of the North Dakota Century Code (Supp.1981)." Dooley was obligated to charge and accept an attorney's fee of not more than 25 percent of the gross amount of the Bureau's subrogation interest. Dooley cannot avoid this by contracting with Cahill for a fee of "one-third of all recoveries" including the Bureau's subrogation interest. The Hearing Body found such a contract results in Cahill being charged and paying a fee that is excessive and unreasonable in violation of N.D.R. Prof. Conduct 1.5(a).
We believe the Board's analysis is flawed.
[¶ 15] When Bureau claimants seek recovery for their injuries from third persons, N.D.C.C. § 65-01-09 governs the Bureau's subrogation rights and provides the Bureau must pay attorney fees on funds recovered for the Bureau based on given percentages.[1] In Jones v. Pringle & *624 Herigstad, P.C., 546 N.W.2d 837 (N.D.1996), we interpreted N.D.C.C. § 65-01-09 in connection with a claim that the statute placed a cap on attorney fees a private attorney could charge an injured party. In Jones, the attorney charged the injured claimant in a third-party action a 33 1/3 percent contingent fee. After settlement, the Bureau suspended the injured claimant's benefits. The injured claimant objected to the attorney charging a 33 1/3 percent fee on the portion of her settlement equal to the benefits suspended by the Bureau when the Bureau only credited her with a 25 percent attorney fee on the suspended benefits. The injured claimant argued the attorney was entitled to only a 25 percent fee for the Bureau's subrogation interest, including the suspended benefits. We rejected her argument, and held N.D.C.C. § 65-01-09 does not regulate fees private attorneys may charge their injured clients in third-party actions:
The statute does not regulate attorney fees payable by injured claimants on funds they recover due to the efforts of their private attorneys. The Bureau internally accounts for attorney fees on suspended benefits by using the percentages required by N.D.C.C. § 65-01-09; this practice does not impose a legal obligation on private attorneys to follow the same procedure in calculating their attorney fees. Only the legislature could impose such a requirement, and it has not done so here. We conclude N.D.C.C. § 65-01-09 requires the Bureau to pay set attorney fees when funds are recovered for the Bureau from third parties through personal injury actions; the statute does not regulate the fees private attorneys may charge clients other than the Bureau in such actions.
Jones, 546 N.W.2d at 841.
[¶ 16] The Board contends Dooley's fee violates the statute and Jones because Cahill did not receive any part of the money which went to the Bureau and for which he paid Dooley a fee. The Board argues the statutory provision for attorney fees applies only to funds actually recovered for the Bureau, and Dooley should likewise be limited to the statutory amount of attorney fees for the funds he recovered for the Bureau. Because the net effect of Dooley's fee agreement with Cahill was to have Cahill pay for a portion of attorney fees for the Bureau's recovery, the Board argues Dooley's fees were unreasonable.
*625 [¶ 17] We reaffirm what we said in Jones: N.D.C.C. § 65-01-09 does not regulate the fees attorneys may charge private clients in third-party actions. The statute only caps the amount of attorney fees the Bureau must pay from its general fund to an attorney for recovery of its subrogated interest. The statute does not obligate an attorney to charge and accept as a fee not more than 25 percent of the gross amount of the Bureau's subrogated interest. Nothing in the language of the statute or in Jones forbids an injured claimant from agreeing to pay attorney fees for obtaining a portion of the Bureau's recovery of its subrogated interest.
[¶ 18] Although the net effect of Dooley's fee agreement with Cahill is that Cahill paid attorney fees for a portion of the Bureau's recovery, the record shows Dooley on several occasions fully explained the nature of the fee agreement to Cahill. The agreement was in writing and stated the method by which the fee would be determined and whether expenses would be deducted before or after the contingent fee was calculated. See N.D.R. Prof. Conduct 1.5(c). Dooley performed hypothetical examples for Cahill of how funds would be disbursed if there was a recovery. Dooley explained to Cahill how the Bureau's subrogated interest would be calculated and how the statutory attorney fees would be credited back to him. There is no claim Cahill was fraudulently induced into signing the fee agreement or there was overreaching on the part of Dooley. Indeed, Cahill testified, and the Board found, Cahill understood and agreed the gross recovery included the Bureau's subrogation interest and he would pay Dooley one-third of the gross recovery as an attorney fee.
[¶ 19] The fee arrangement may also be viewed as an agreement for Cahill to pay Dooley an almost 42 percent contingent fee for the amount of his own recovery. The Board concedes a 42 percent contingent fee would not be unreasonable as a matter of law in this case. Although there is evidence Dooley charged more than the customary fee in this locality for these third-party actions, the record shows there were difficult issues in the case, the case was time consuming, and special expertise was required to perform the necessary legal services. The costs incurred exceeded $65,000, and undoubtedly would have been much higher if the case had gone to trial. The result of the litigation was favorable to Cahill. There was testimony Dooley's effective contingent fee of 42 percent was not unreasonable when compared to the fees customarily charged in the locality for similar types of cases.
[¶ 20] Dooley fully disclosed to Cahill his fee would be one-third of the gross amount of the recovery, and Cahill voluntarily agreed to this arrangement. We conclude Dooley did not charge Cahill an unreasonable fee in violation of N.D.R. Prof. Conduct 1.5(a), and Cahill is not entitled to restitution.

B
[¶ 21] Conflicts of interest in a lawyer's representation of a client are prohibited by N.D.R. Prof. Conduct 1.7(a):
(a) A lawyer shall not represent a client if the lawyer's ability to consider, recommend, or carry out a course of action on behalf of the client will be adversely affected by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests.
[¶ 22] In concluding Dooley violated N.D.R. Prof. Conduct 1.7(a), the Disciplinary Board reasoned:
Dooley cannot represent Schwandt for loss of consortium so as to reduce the amount of the Bureau's subrogation interest. At the time he undertook to represent Schwandt he was representing the Bureau and had a duty to the Bureau to recover for it the full amount of its subrogation interest provided by statute.
*626 We disagree with the Board's finding Dooley had an impermissible conflict of interest in this case.
[¶ 23] The hearing body, in addressing this issue, spoke of the "duty" Dooley "owed the Bureau as its lawyer." However, Dooley's relationship with the Bureau was not, under these circumstances, an ordinary attorney-client relationship. As we noted in Jones, 546 N.W.2d at 841 n. 1, N.D.C.C. § 65-01-09 requires an injured worker who brings a third-party action to act as trustee for the Bureau's subrogation interest, and by implication also requires the injured employee's attorney to represent the Bureau's subrogation interest. Attorneys who bring third-party actions for injured employees enter into a contractual relationship with the Bureau that essentially sets forth the requirements of the statute. Here, Dooley was required by the contract to calculate the Bureau's interest according to the statute and remit that amount to the Bureau, and he agreed the Bureau's subrogation interest "may not be reduced by settlement, compromise, or judgment...." There was no fee negotiation, and Dooley was not free to decline this mandatory relationship with the Bureau. Courts analyzing similar statutorily-imposed obligations upon attorneys have ruled no attorney-client relationship exists between the attorney and statutory beneficiary. See, e.g., Curtis v. Simpson Chevrolet, 348 F.Supp. 1062, 1068 (E.D.Pa.1972) (construing Pennsylvania law); Dearing v. Perry, 499 N.E.2d 268, 273 (Ind.App.1986); Haney v. State, 850 P.2d 1087, 1092 (Okl.1993); Gibson v. Johnson, 35 Or.App. 493, 582 P.2d 452, 456 (1978); City of Garland v. Huston, 702 S.W.2d 697, 699 (Tex.App.1985). In Gibson, 582 P.2d at 456, the court, in addressing a contention a statute authorized government attorneys to represent Aid to Dependent Children recipients as clients, the court said:
The essence of this statutorily created relationship is that of assignor-assignee. The mere fact that the assignor is required to cooperate with the attorney for the assignee does not establish an attorney-client relationship.
We have similarly defined the Bureau's subrogation interest under N.D.C.C. § 65-01-09 as "`a legal operation by which a third person who pays a creditor succeeds to his rights against the debtor as if he were his assignee.'" Meyer v. North Dakota Workers Compensation Bureau, 512 N.W.2d 680, 682 (N.D.1994) (quoting Ness v. St. Aloisius Hospital, 313 N.W.2d 781, 782 (N.D.1981)). Accordingly, we view Dooley's relationship with the Bureau not as an attorney-client relationship, but as a contractual relationship imposed by operation of law.[2]
[¶ 24] The Board has not cited, nor have we found, any reported decision subjecting an attorney to discipline under circumstances similar to those present in this case. We have discovered cases in the workers compensation context, however, where courts have rejected claims that employee's attorneys should not be allowed to recoup their statutory percentage attorney fees on the employer's insurance carrier's subrogated interest because the attorneys had a conflict of interest by failing to protect, or by taking adverse action against, the carrier's subrogated interest. For example, in Langley v. H.K. Ferguson Co., 186 Ill.App.3d 1036, 134 Ill.Dec. 693, 542 N.E.2d 1200, 1204-05 (1989), the court said:
Although [the employer] asserts that [the employee's] counsel is not entitled to the attorney's fees in question because he failed in his alleged duty to protect the employer's lien, we note ... "the Workers' Compensation Act ... provides that the duty of protecting the *627 employer's lien lies with the court". We note too that employe[e]s' attorneys often represent interests that are some-what different from those of employers in cases such as this. Indisputably [the employer] must pay its fair share of the cost of recovering the benefits it has recovered. It cites neither law nor policy that justifies excusing it from paying the fee statutorily imposed for the services and benefits it has received.
(Citations omitted). See also Murray v. Lincolnshire Group, Ltd., 167 Ill.App.3d 978, 118 Ill.Dec. 641, 522 N.E.2d 96, 99 (1988) (same); Page v. Hibbard, 142 Ill.App.3d 788, 96 Ill.Dec. 914, 491 N.E.2d 1374, 1380 (1986), affirmed in part and reversed in part on other grounds, 119 Ill.2d 41, 115 Ill.Dec. 544, 518 N.E.2d 69 (1987) (same); Curtis, 348 F.Supp. at 1068 (holding, although employee's attorney attempted to set aside subrogation lien, the employer's insurance carrier must still pay proportionate part of attorney fees because "[i]n circumstances such as this, a fee is not payable to counsel because he represents the employer with all the duties attendant in the attorney-client relationship, but because a fund has been created through his efforts from which the employer will benefit.").
[¶ 25] This Court has embraced the concept protection of the Bureau's subrogation interest lies primarily with the court. In Meyer, 512 N.W.2d at 682, we ruled the Bureau's subrogation interest does not extend to a spouse's claim for loss of consortium. We also ruled injured workers cannot shield settlement amounts from the Bureau's right of subrogation by arbitrarily allocating amounts to the spouse's claim for loss of consortium:
To prevent arbitrary apportionment, the bureau should be notified prior to settlement so it can participate in any apportionment of settlement funds between the injured employee and the employee's spouse. Failure to notify the bureau prior to settlement, however, does not automatically invalidate amounts apportioned to a spouse's loss of consortium claim. The inquiry is whether the apportionment is reasonable in light of the specific circumstances. Only amounts which are reasonably related to a spouse's injuries may be protected from the bureau's right of subrogation.
Meyer, 512 N.W.2d at 683.
[¶ 26] Dooley's actions in this case can be viewed as awkward when judged against the present legal setting. Schwandt was not a party in Cahill's action against Burlington Northern, but the record shows Dooley communicated to Cahill and Schwandt early during his representation about a possible loss of consortium claim and often encouraged their marriage to strengthen that claim. It was not until November 5, 1992, that this Court ruled in Butz v. World Wide, Inc., 492 N.W.2d 88, 91 (N.D.1992), a claim for loss of consortium must be joined with the underlying personal injury suit or be permanently barred, absent a compelling justification for non-joinder. Apparently aware that in Milde v. Leigh, 75 N.D. 418, 28 N.W.2d 530 (1947), this Court ruled the statute of limitations for a consortium action begins to run at the time the spouse suffers the loss, which is not necessarily the same time the injured spouse's action for personal injury accrues, Burlington Northern mentioned Schwandt's loss of consortium claim in its settlement and release, and required her express, signed waiver of any claim arising from Cahill's injury. The Bureau also signed the settlement and release and had inserted a clause stating it had not waived its subrogation interest in any claims for consortium. Although the Bureau was a party to the settlement and release, no allocation of the settlement amount was made to Schwandt's consortium claim at that time. However, Meyer, which held the Bureau's subrogation interest does not apply to consortium claims and set forth the proper procedure for allocation and protection of the Bureau's subrogation interest, was not decided until February 23, 1994, after the settlement *628 was completed and one day after Dooley reissued checks reflecting the 50 percent allocation for Schwandt's consortium claim. Dooley cannot be faulted in hindsight for his actions while the law in this area continued to evolve.
[¶ 27] Dooley's contractual and statutorily-imposed obligation to protect the Bureau's subrogation interest did not extend to Schwandt's claim for loss of consortium. While Dooley's allocation of 50 percent of the settlement to Schwandt's claim might have been challenged as unreasonable, the Bureau did not object so far as this record shows. Although any allocation to a claim for loss of consortium will necessarily affect the Bureau's subrogation interest, we decline to hold this procedure in itself amounts to either an impermissible conflict of interest within the meaning of Rule 1.7(a), or a breach of the contractual and statutorily-imposed obligation to protect the Bureau's subrogation interest. To hold otherwise would require employment of separate counsel to pursue a claim for loss of consortium in any case in which the Bureau has a subrogation interest, even though the claim is subject to compulsory joinder. This result would directly contradict the reasoning for adopting compulsory joinder in these situations: "reduce[d] litigation expenses for the parties." Butz, 492 N.W.2d at 91. The Meyer alternatives of Bureau participation in any apportionment of settlement funds or later judicial determination of the reasonableness of the allocation provide the primary protection for the Bureau's subrogation interest.
[¶ 28] Disciplinary counsel bears the burden of proving each alleged violation of the disciplinary rules by clear and convincing evidence. Disciplinary Action Against Larson, 485 N.W.2d 345, 348 (N.D.1992). We conclude the Board failed to establish by clear and convincing evidence that Dooley had an impermissible conflict of interest in violation of N.D.R. Prof. Conduct 1.7(a).

C
[¶ 29] Upon termination of representation, a lawyer has a duty under N.D.R. Prof. Conduct 1.16(e) to surrender property to which the client is entitled:
(e) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.
See also Anseth, 1997 ND 66, ¶¶ 21-27, 562 N.W.2d 385.
[¶ 30] The Disciplinary Board found Dooley twice violated this rule. The Board concluded Dooley, as the Bureau's lawyer, had no right to withhold $75,000 from the Bureau's subrogation interest on Schwandt's behalf. The Board further concluded Dooley, upon Schwandt's termination of Dooley's representation, should have promptly paid over the money to Schwandt's lawyer upon being advised of the termination of his representation and the identity of the lawyer Schwandt retained for further representation of her claim. Because we have concluded no attorney-client relationship existed between Dooley and the Bureau, we find no violation of N.D.R. Prof. Conduct 1.16(e) by Dooley's withholding the $75,000 from the Bureau's subrogation interest on Schwandt's behalf. We agree with the Board Dooley violated the rule by failing to promptly return to Schwandt and her new attorney those funds upon notification of termination of representation.
[¶ 31] Schwandt terminated Dooley's representation in April 1995. Schwandt's new attorney and the Bureau's attorney asked for the funds in November and December 1995. Dooley responded by refusing to turn over the money without a court order or an agreement that paid him "an *629 agreeable sum." He also claimed an attorney's lien on the funds. Dooley did not relinquish the funds until ordered to do so by the court in August 1996, about 15 months after termination of representation.
[¶ 32] At the time Dooley refused to deliver the money to Schwandt and the Bureau, Dooley had not earned any fee from Schwandt and no payment of any fee was due him. Moreover, N.D.C.C. § 35-20-08 allows an attorney a lien "for a general balance of compensation," and Dooley would not have been entitled to the entire amount of $75,000 under the contingent fee agreement he had with Schwandt. We conclude Dooley violated N.D.R. Prof Conduct 1.16(e).

D
[¶ 33] Under N.D. Stds. Imposing Lawyer Sanctions 4.13, reprimand is generally appropriate when a lawyer is negligent in dealing with client property. We therefore adopt the Disciplinary Board's recommendation Dooley be reprimanded for violating N.D.R. Prof. Conduct 1.16(e).

III
[¶ 34] We have considered the Disciplinary Board's report and order Dooley be reprimanded for violating N.D.R. Prof. Conduct 1.16(e).
[¶ 35] GERALD W. VANDE WALLE, C.J., and WILLIAM A. NEUMANN, MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.
NOTES
[1] At the pertinent time, N.D.C.C. § 65-01-09 provided in part:

When an injury or death for which compensation is payable under provisions of this title shall have been sustained under circumstances creating in some person other than the fund a legal liability to pay damages in respect thereto, the injured employee, or his dependents may claim compensation under this title and proceed at law to recover damages against such other person. The fund shall be subrogated to the rights of the injured employee or his dependents to the extent of fifty percent of the damages recovered up to a maximum of the total amount it has paid or would otherwise pay in the future in compensation and benefits for the injured employee. The bureau's subrogation interest may not be reduced by settlement, compromise, or judgment.... When there is recovery of damages in the action the costs of the action, exclusive of attorneys fees, shall be prorated and adjusted on the percentage of the total subrogation interest of the bureau recovered to the total recovery in the action. The bureau shall pay attorney fees to the injured employee's attorney from the bureau general fund as follows:
1. Twenty percent of the subrogation interest recovered for the bureau when legal action is not commenced.
2. Twenty-five percent of the subrogation interest recovered for the bureau when action is commenced and settled before judgment.
3. Thirty-three and one-third percent of the subrogation interest recovered for the bureau when recovered through judgment.
The above provisions as to costs of the action and attorney fees is effective only when the injured employee advises the bureau in writing the name and address of his attorney, and that he has employed such attorney for the purpose of collecting damages or of bringing legal action for recovery of damages. If a claimant fails to pay the bureau's subrogation interest within thirty days of receipt of a recovery in a third party action, the bureau's subrogation interest shall be the full amount of the damages recovered, up to a maximum of the total amount it has paid or would otherwise pay in the future in compensation and benefits to the injured employee or his dependents, and no costs or attorney fees will be paid from the bureau's subrogation interest.
[2] We recognize N.D.R. Prof. Conduct 1.7(a) forbids an attorney from representing a client if that representation would be adversely affected by the lawyer's responsibilities to a "third party." The parties neither briefed nor argued the applicability of this language to the facts of this case. Therefore, we do not decide whether the Bureau is a "third party" within the meaning of the rule.